HOMETOWN FINANCIAL, INC., and Continental Financial Holdings, Inc., Plaintiffs,

and

Federal Deposit Insurance Corporation, Plaintiff-intervenor,

v.

The UNITED STATES, Defendant.

No. 90–843C.

United States Court of Federal Claims.

May 22, 2003.

James H. Falk, Jr., Washington, DC, for plaintiff.

Ellis Merritt, Jr., Dallas, TX, for plaintiff-intervenor.

Richard B. Evans, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

The United States has moved for summary judgment with respect to all of plaintiffs' (Hometown Financial, Inc. ("HFI") and Con-

tinental Financial Holdings, Inc. ("CFH")), and plaintiff-intervenor's (Federal Deposit Insurance Corporation ("FDIC")) damages claims.[1]

On August 23, 2002, the court held that the United States was potentially liable for damages arising from a breach of the conversion agreement between plaintiffs and the government, following the enactment of the Financial Institution, Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). In their pleadings, plaintiffs, HFI and CFH seek the following damages: (1) a return of their investment of $2.05 million, (2) their carrying costs, and (3) their lost profits. Plaintiffs' Opposition to Summary Judgment at 11. Plaintiff-intervenor, FDIC, seeks damages for: (1) Hometown Federal Savings Bank's ("New Hometown's") lost equity value as measured by the difference between the positive equity value New Hometown would have today but for the breach and the negative equity value of the New Hometown's Receivership; or (2) alternatively, the value of the supervisory goodwill and the regulatory forbearance lost by the breach or restitution, as measured by the value of the benefit conferred on the government. Plaintiff-intervenor's Opposition to Summary Judgment at 2.

## BACKGROUND FACTS

The background facts in this case are discussed in this court's August 23, 2002 opinion, in which the court found that passage of FIRREA in 1989 resulted in a breach of contract regarding the government's approval of the conversion of Hometown Federal Savings and Loan Association ("Old Hometown") into New Hometown. The facts material to resolving the pending motion are undisputed, unless otherwise noted.

New Hometown was created in response to the deteriorating financial condition of Old Hometown, an Indiana mutual savings and loan association. In particular, on May 8, 1987, Old Hometown submitted a plan of conversion and a business plan. Old Hometown's plan called for outside investors, including the principals of the National Capital Group ("NCG"), a Washington, D.C.-based thrift consulting firm, to acquire Old Hometown. The NCG principals were Philip Weintraub and Louis Mayberg. NCG was responsible for preparing the conversion and business plans for Old Hometown.

The business plan, submitted on March 23, 1987, called for a capital infusion of $2.05 million by a holding company, HFI, which would hold all the stock of the New Hometown thrift. During 1987, Old Hometown's financial condition continued to deteriorate.

By letter dated December 22, 1987, the Federal Home Loan Bank Board ("FHLBB") provisionally approved the supervisory conversion. Subsequently, on March 1, 1988, plaintiffs and Old Hometown submitted a new business plan dated February 29, 1988. The new business plan proposed a revised structure under which a new entity, CFH, was introduced. CFH would be the majority shareholder in HFI, and the majority shareholders of CFH would be Messrs. Weintraub and Mayberg.

Under the March 1, 1998 business plan, the investors anticipated that total assets would increase in the first year from $56 million to $109 million, a 94.6 percent increase. In the second year, assets were projected to grow by 34.9 percent to $147 million. By the end of the third year of the plan, assets were projected to grow by 5.4 percent and reach $155 million.

---

1. The United States has also moved to dismiss the FDIC's damage claims on some of the same grounds. Because the court has considered materials outside the pleadings in connection with the government's motion, summary judgment is the appropriate vehicle for resolving these issues. Rule 12(b) of the United States Court of Federal Claims ("RCFC") states:

> If, on a motion asserting the defense numbered [12(b)](6) for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56.

The decision on which course to choose is a matter left entirely to the court's discretion. See Wright and Miller, 5A Fed. Prac. & Proc. Civ.2d § 1366 (2002). ("The court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.")

The parties agree that the proposed business plan stood in marked contrast to Old Hometown's historical five-year compound growth rate of only 3.9 percent. Under the proposed business plan, the investors projected profitability by the end of the third quarter of the first year following the conversion.

The FHLBB granted final approval for the conversion of Old Hometown in Resolution 88–513, dated June 28, 1988. The FHLBB placed several stipulations on its action. Among other things, the resolution required plaintiffs to stipulate that the thrift would operate within the constraints of the business plan, "including the projected financial statements." As noted above, the business plan also called for the infusion of $2.05 million of capital in the newly converted bank.

On June 30, 1988, New Hometown opened for business. In its first year of operation after conversion, New Hometown failed to attain the financial benchmarks in its business plan. New Hometown's assets did not increase by 94.6 percent, as projected in the business plan, but increased by only 39.3 percent to $76,023,000. Similarly, New Hometown was not able to increase deposits by 99.3 percent to $98,171,000, as it had projected. Instead, deposit liabilities increased by only 25.3 percent to $67,877,000. Thus, instead of being profitable by the end of the third quarter, New Hometown lost another $311,000.

New Hometown had intended to reach its ambitious goals by marketing jumbo CDs for municipal accounts. One of the reasons that New Hometown could not achieve its goals was because of new legislation passed in April 1989 by the Indiana legislature that prohibited institutions from being a depository of state or municipal funds if the institution had a ratio of total capital to total assets of less than (1) the minimum required by the governmental supervisory body of the institution, or (2) three percent. Ind.Code Ann. § 5–13–8–1 (1989).

Because New Hometown could not meet this new criteria, it was precluded from continuing to act as a depository of state and municipal funds. As a result, New Hometown lost approximately $11 million in public deposits during the third quarter of 1989, and was precluded from accepting any such future municipal deposits.

There were several other reasons for New Hometown's failure to achieve the goals in its business plan. For example, the business plan contemplated certain advances from the FHLBB which did not all materialize. The FHLBB also disapproved other proposed actions by New Hometown to grow the assets of the bank. The FHLBB disapproved New Hometown's proposed acquisition of another thrift which would have provided for the recapitalization of the combined entity and would have resulted in New Hometown's worth reaching three percent of its liabilities on a Generally Accepted Accounting Principles ("GAAP") basis. In addition, the FHLBB rejected a New Hometown proposal to put loan production offices into a builder's sales office. The FHLBB also placed limits on New Hometown's ability to utilize certain types of deposits.[2] As a result of these and other issues, identified by the bank examiners, and set forth below, New Hometown's assets had shrunk by $7,409,000 or 9.7 percent, by the end of 1989. Between July 1989 and December 1989, New Hometown lost another $393,000. New Hometown management's projected 1990 losses of $660,000.

Following passage of FIRREA, New Hometown failed to meet the redefined regulatory capital standards and was required to submit a capital plan detailing its method for coming into capital compliance. As of December 31, 1989, New Hometown had $5,696,925 of remaining supervisory goodwill on its books.

In response to FIRREA, in December 1989, New Hometown submitted a capital plan. As part of that plan, New Hometown relied upon the "understanding[s]" of the December 1987 "forbearance" letter it had obtained as part of the conversion process. The post-FIRREA plan did not make any

---

**2.** As set forth in the FDIC's Opposition to the Defendant's Motion for Summary Judgment, the FDIC, "does not argue these actions were breaches of New Hometown's goodwill contract." FDIC's Opposition at 11.

provision for the immediate infusion of capital. Rather, New Hometown proposed a plan that continued to rely primarily on a policy of aggressive growth.

On January 16, 1990, both the FDIC and the Office of Thrift Supervision ("OTS") conducted examinations of New Hometown utilizing financial data as of December 1989. As a result of this examination, it was concluded that New Hometown was "not viable as a going concern." The OTS also concluded that the underwriting of commercial and commercial real estate lending by New Hometown was unsafe and unsound. The OTS further concluded that the deficiencies in New Hometown's underwriting procedures were the primary cause of a deterioration of asset quality, which increased substantially during the review period (the previous fifteen months).

On June 7, 1990, the OTS appointed the Resolution Trust Corporation ("RTC") as the receiver for New Hometown and created a new federal mutual savings association, Hometown Savings Bank ("New Federal"). The RTC was then appointed conservator for New Federal and acquired the assets and liabilities of New Hometown as part of an assumption agreement.

On December 14, 1990, the OTS declared New Federal insolvent and appointed the RTC as receiver ("RTC–Receiver"). Eventually, the RTC liquidated the assets of New Federal, and at the termination of the receivership, New Hometown's receivership deficit included: $8.1 million in losses and administrative expense, $15.4 million in taxes, $6.3 million in interest, and approximately $254,000 in miscellaneous costs, for a total of approximately $30 million.

On July 1, 1994, the RTC–Receiver assigned to RTC, in its corporate capacity ("RTC–Corporate") all of New Hometown's and the RTC–Receiver's "rights with respect to actions, judgments and claims," to be asserted on behalf of the failed bank.[3] The receivership was deactivated as of September 1, 1994, and all the remaining assets in liquidation were purchased by the RTC in its corporate capacity. By statute, the RTC was terminated in 1995, and its functions were transferred to various components of the FDIC. The governmental-arm of the FDIC has stated that as of December 2000, the government has not been reimbursed $8.1 million in deposit-insurance payments and $7.9 million of accrued interest. As a consequence, the FDIC is New Hometown receivership's largest creditor, with a subrogated claim of approximately $16 million.[4]

### DAMAGE THEORIES

Plaintiffs contend that they are seeking "restitution" and "lost profits." They assert that their restitution claim totals $2.5 million. This sum consists of $2.05 million that was infused into New Hometown via the stock purchase of Old Hometown, $200,000 attributable to servicing interest payments on debentures that were issued to finance the stock purchase, and transactions costs totaling $250,000. Plaintiffs base their "lost profits" claim on the theories espoused by the FDIC's expert, Dr. William McGuire.[5]

---

**3.** Plaintiffs assert that the various receiverships and transfers are not legally valid and therefore plaintiffs are the only parties to assert claims for breach of contract on behalf of New Hometown. The plaintiffs' assertions in this regard are irrelevant. Having failed to timely challenge the receiverships and transfers in Federal District court, they are bound by the outcome of those various actions. 12 U.S.C. § 1464(d)(2)(E) (Supp. III 1991); 12 U.S.C. § 1821(d)(6)(A) (1994).

**4.** To be more precise, the $16 million subrogated claim represents monies owed to the government for deposit insurance payments made by the RTC for the benefit of New Hometown's former depositors. When the RTC was terminated, the claim held by the RTC was transferred to the Federal Savings and Loan Insurance Corporation Resolution Fund or "FRF," which is managed by the FDIC. The FDIC also succeeded to the RTC's receivership role and in that capacity filed the present action for breach of contract damages against the United States. Any money the RTC collects from the action would have to be paid in accordance with the purchase of sale by which the RTC took over New Hometown's assets and liabilities, and which requires that the FRF's subrogated claim to be paid ahead of any other outstanding creditors. Under the applicable agreements and laws, New Hometown's shareholders would be the last creditors to be paid.

**5.** Dr. William J. McGuire, is the president and Chief Executive Officer of McGuire Performance Solutions, Inc., a national consulting firm pro-

Plaintiffs contend that they are working with the FDIC on this case through a joint cooperation agreement that includes experts.[6]

The FDIC damage theories include the lost profits the plaintiffs seek together with theories of restitution. All of the FDIC's theories are based on the report of Dr. McGuire. Dr. McGuire's report states that he analyzed two basic measures of damages: lost equity damages as of June 30, 1999, which he calculated to be $40,737,869 and damages based on the value of lost regulatory goodwill and lost regulatory capital forbearances, which as of the date of breach, he valued at $2,571,045 and $571,842 respectively. Dr. McGuire states in the final opinion section of his report that: "The lost equity damages value presented above accurately reflects the losses caused when Hometown was no longer allowed to utilize the previously agreed on forbearances and regulatory accounting practices." Defendant Appendix ("Def.App.") 1039. He further opines that "[d]amages based on the value of lost regulatory goodwill and lost regulatory capital forbearances grossly understate the total damages Hometown suffered if, as I believe is the case, if (sic) would have survived and prospered absent the breach." Def.App. 1040.

Dr. McGuire's opinion concerning the value of equity allegedly lost by New Hometown is based entirely on the use of a specially customized application of the Secura Group projection model, which Dr. McGuire concedes he had never utilized before this case. Dr. McGuire's projection of New Hometown's earnings involved inputting data from New Hometown's balance sheet as of June 30, 1998. Thereafter, he relied upon the performance of a peer group. In particular, Dr. McGuire based his projections on the performance of eleven other thrift institutions in Indiana that he believed, based on their balance sheets and market locations, were close approximations to Hometown as of June 1989. The starting point for Dr. McGuire's projection, using the computer model, is June 30, 1989. He chose this quarter because he believes "it is the closest quarter end to where (from a business perspective) the impacts of the FIRREA legislation on thrifts was clear." Def.App. 1026. Thereafter, he claims that his projection is based on the performance of a "peer group." Def.App. 1027. Dr. McGuire concedes that he did *not* conduct a specific analysis of New Hometown's performance relative to the peer group as of June 1989. Def.App. 1077.

Additionally the FDIC concedes:

1) On the average, thrifts in the peer group began the process with fewer branches than New Hometown. (The average number of branches for the peer group was 2.3; while New Hometown had 6 in June 1989). Def.App. 1161;

2) Thrifts in the peer group had much lower rates of growth than New Hometown projected in its business plans. Def.App. 1115;

3) When choosing the members of the peer group, Dr. McGuire did not consider whether any of them had "goodwill" on their books. Def.App. 1117;

4) Dr. McGuire did not know if any member of the peer group was prohibited by Indiana law from receiving deposits from municipalities. Def.App. 1118;

5) Dr. McGuire did not consider whether any member of the peer group lost money in each of the first three quarters of the projection, even though this

---

viding balance sheet management services for financial institutions. Among his other positions, Dr. McGuire served as Vice President for Information and Analysis for the Federal Home Loan Bank Board of Cincinnati. He has been a professor of finance at various universities and received his Ph.D. in economics from the University of North Carolina in 1978.

6. The United States contends that plaintiffs should be barred from relying upon Dr. McGuire's expert report on the grounds that they failed to produce the report as required by court orders, and that Dr. McGuire represents that he prepared his damages analysis for the FDIC alone and does not purport to identify damages for any of the plaintiffs. As discussed infra, because the court concludes that plaintiffs do not have standing to assert a lost profits damage claim belonging to the failed thrift, the court does not reach the question of whether plaintiffs should be allowed to rely upon Dr. McGuire's report.

information was available. Def.App. 1120;

6) None of the thrifts selected for the peer group had failed. Def.App. 1129; and

7) Dr. McGuire was aware that the members of the peer group had fewer advances from FHLBB than did New Hometown (Def.App. 1181), but he had no knowledge of their average FHLBB loan balance. *Id.*

Using his peer group, which Dr. McGuire contends is representative despite the differences identified above, Dr. McGuire projected New Hometown's performance "from the yield and cost values reported by the peer group, applied to balance sheet data incorporating peer group growth behavior." Def. App. 1029. In order "[t]o ensure Hometown's orderly growth and development from its 1989 position into a stronger future, the addition of earning assets was needed." Def. App. 1030. Therefore, Dr. McGuire assumed that "in the absence of the breaching provisions of FIRREA, the [New Hometown] investors would have infused an additional $1.5 million tangible capital into Hometown when the need for this was obvious, but not yet critical, i.e., as of 9/30/89." *Id.* Dr. McGuire then assumed that this new capital would be used to support a wholesale leverage strategy, whereby the purchase of $30 million in mortgage backed securities ("MBS") would have been financed through the use of reverse repurchase agreements. Def.App. 1030. According to Dr. McGuire, the income that New Hometown would have realized as a result of this wholesale leverage strategy would have been "key to Hometown's survival." Def.App. 1031.

Dr. McGuire's strategy for New Hometown stood in marked contrast to New Hometown's February 29, 1998 business plan, which projected substantially smaller use of MBS. For example, in 1989, Hometown projected $24.8 million in MBS, whereas, Dr. McGuire's model estimated $37 million. In 1990, Hometown's business plan estimated $33 million in MBS, whereas Dr. McGuire estimated $39.6 million in MBS.

Moreover, New Hometown's actual use of MBS between June 1989 and December 1989 was $6.2 million, increasing to $3.4 million as of March 1990.

Dr. McGuire acknowledged that New Hometown's management team had significant weakness, and thus, he assumed for the purpose of his model that they were not in charge, but rather New Hometown was in the hands of the management of the peer group.

Even though Dr. McGuire's projections vary substantially from the business plan, Dr. McGuire maintains that New Hometown's business plan was flexible and New Hometown would have developed new growth strategies. In addition, Dr. McGuire's report states that the model established the minimum performance that New Hometown's management team could have achieved.

Dr. McGuire acknowledges that he did not conduct any historical analysis of the strategies of the members of the peer group. Def. App. 1128. Therefore, he did not know whether any member of the peer group employed the wholesale strategy utilizing mortgage backed securities which he employed in his model. Def.App. 1156.

Using his model, Dr. McGuire calculated the equity value New Hometown would have had "but for" the breach using two economic valuation methodologies: the equity multiplier method and the income multiplier method. Using the equity multiplier method, Dr. McGuire concluded that by June 30, 1999, New Hometown would have had net tangible equity of $8,427,700. Def.App. 1033. From this sum, Dr. McGuire subtracted $804,694, the value he assigned to the regulatory goodwill on June 30, 1999. Def.App. 1034. To this amount he added the amount of "negative" equity which he contended was the difference between New Hometown's assets and liabilities at the time New Hometown was placed in receivership, which was a negative $30,049,199.[7] Thus, he concludes that

---

7. According to Dr. McGuire, this sum is made up of: $6,316,167 in interest; $15,346,114 in taxes; $8,121,262 in losses and administrative ex-
penses; and $254,646 in miscellaneous costs. Def.App. 1034.

New Hometown's lost equity is $37,613,039. *Id.*

Dr. McGuire then determined the current valuation of New Hometown's equity using the net earnings to book value equity multiplier approach. Using this approach, Dr. McGuire multiplied $1,020,900, the net income he hypothesized New Hometown would have had in the twelve months preceding June 30, 1999, by the multiplier value of 15, which represented the value applicable to all Indiana thrifts. Def.App. 1034. Using this formula, Dr. McGuire opined that New Hometown's lost earnings are $43,862,699 (the sum of $13,813,500 current value and the negative $30,049,199 equity in the receivership). *Id.*

In conclusion, Dr. McGuire states that "[d]amages from lost equity value are thus calculated to fall between $37,613,039 and $43,862,699. A reasonable approach in this case is to take the mid-point of the range. Thus damages measured by lost equity value for Hometown are calculated as $40,737,869." *Id.*

As noted above, Dr. McGuire also calculated damages for the FDIC by valuing New Hometown's loss of goodwill and regulatory forbearances following passage of FIRREA. Dr. McGuire explained in his report that he valued the loss of goodwill by "isolating the value provided by regulatory goodwill compared to alternate means of attaining capital compliance . . . . I have chosen a hypothetical preferred stock issuance as the alternate compliance vehicle." Def.App. 1035. Dr. McGuire's report goes on to explain that, "damages are the present value of the incremental costs associated with issuing and servicing this alternative form of capital, compared to regulatory goodwill." Def.App. 1036. Dr. McGuire calculated that these damages at the time of the breach are $2,571,045. Def.App. 1039. In addition, Dr. McGuire calculated the value of the forbearances received by New Hometown and using the same methodology that he used to calculate the value of New Hometown's goodwill. Dr. McGuire concluded that damages resulting to New Hometown from the loss of regulatory capital forbearances as of December 1989 are $571,843. *Id.*

## DISCUSSION

## I. *STANDARD OF REVIEW FOR SUMMARY JUDGMENT*

Summary judgment is required where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Golden Pac. Bancorp v. United States,* 15 F.3d 1066, 1071 (Fed.Cir.1994); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, if the nonmoving party produces sufficient evidence to raise a question that would alter the outcome of the case, summary judgment must be denied. In making this determination, the court is mindful that any doubt over a factual issue must be resolved in favor of the nonmoving party. *Id.* at 587–88, 106 S.Ct. 1348.

The party moving for summary judgment has the burden initially of pointing out the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant discharges this burden, the non-movant must demonstrate specific facts showing a genuine dispute of fact for trial. *Matsushita Elec.,* 475 U.S. at 586–87, 106 S.Ct. 1348; *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994). Thus, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *see also Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[T]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this connection, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, at 586, 106 S.Ct. 1348.

## II. *PLAINTIFFS' DAMAGE CLAIMS*

### A. *Plaintiffs' Restitution Claim*

 Restitution is a remedy for a breach of contract which aims to restore to the non-breaching party any benefit that it might have conferred on the other party as a result of the contract, less any benefit the non-breaching party received under the contract. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380–81 (Fed.Cir. 2001); Restatement (Second) of Contracts 344(c) (1981). In this case, plaintiffs contend that they are entitled to a return of their original investment of $2.05 million under the United States Court of Appeals for the Federal Circuit's ("Federal Circuit's") holding in *Landmark Land v. FDIC*, 256 F.3d 1365 (Fed.Cir.2001). In particular, plaintiffs contend that in *Landmark*, the Federal Circuit determined that where plaintiffs were required to make a capital contribution to acquire a failing thrift as part of their contract with the government and are not able to recoup that contribution because the thrift failed following enactment of FIRREA restitution is an appropriate remedy. *Landmark*, 256 F.3d at 1372–73. As the Federal Circuit later explained in *Castle v. United States*, 301 F.3d 1328 (Fed.Cir.2002), "In *Landmark*, this court affirmed the Court of Federal Claims' award of damages in the amount of the initial $20 million contribution the plaintiff made to the acquired thrift, a contribution which was expressly required by the contract." *Id.* at 1340. Here, the plaintiffs contend that they are entitled to their initial contribution of $2.05 million, which they were contractually required to pay for the stock in the newly converted financial institution in order to receive FHLBB approval.

The government argues that the plaintiffs' reliance on *Landmark* is misplaced on the grounds that "*Landmark* involved acquisition of multiple thrifts in 1982 and 1986. Additionally, the 1982 acquisition was an assisted transaction where there was a written assistance agreement with an integration clause.... It is of greater significance that plaintiffs in *Landmark* asserted a claim for restitution and reliance damages." Def. Reply Br. at 14. In the court's view, none of these distinctions or the government's other arguments against awarding plaintiffs' restitution have merit.

To begin with, it is now clear, following the Federal Circuit's holding in *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1347–48 (2001), that the existence of an assistance agreement is not critical to the issue of contract formation. In addition, the award of *restitution* in *Landmark* is consistent with the holdings of other Circuits, which have uniformly held that restitution is an appropriate remedy in cases where investors were required to make a capital contribution to a failing institution as part of their contract with the government and the contract is breached by FIRREA. Further, these courts have held that the return of an initial capital contribution is an appropriate measure of restitution where, as here, the acquired institution fails following FIRREA and thus the contract is completely frustrated. As the Tenth Circuit ruled in *Resolution Trust Corp. v. Fed. Sav. and Loan Ins. Corp.*, 25 F.3d 1493 (10th Cir.1994):

> The measure of restitution depends on the circumstances of the case and is within the discretion of the trial court.... In a contract seeking restitution, recovery may be measured as the reasonable value of what defendant received in terms of what it would have cost him to obtain it from a person in the claimant's position' as justice requires. Here, the Agencies needed a $6 million capital contribution in order to avoid liquidating Old Security, which they solicited and obtained from the Investors. The fact that the Investors paid in the capital to New Security rather than directly to the Agencies does not affect the Investors' right to restitution. *See* Restatement of Restitution § 110 cmt. b (where promisor fails to perform, restitution is appropriate even though benefit was a transfer to a third party.) [8]

8. The government's argument that restitution is not allowed because the government was not the

*Id.* at 1505 (citations omitted). *See Far West Fed. Bank. S.B. et al. v. United States,* 119 F.3d 1358, 1367 (9th Cir.1997) (The amount of money invested by plaintiffs found to be the reasonable measure of restitution.) *See also, Hansen Bancorp, Inc. v. United States,* 53 Fed.Cl. 92, 104 (2002) (Where plaintiffs were required by contract to make a capital contribution, plaintiffs were entitled to summary judgment in their favor on their claim for a return of the capital contribution as restitution.)

This court previously held that plaintiffs' agreement to acquire Old Hometown and to infuse $2.05 million in capital into the converted institution was made in exchange for the forbearances and treatment of goodwill that were given by the FHLBB. *Hometown Financial, Inc. v. U.S.,* 53 Fed.Cl. 326 (2002). The court further held that the government also received a benefit under this contract, as the supervisory agent who recommended approval of the transaction explained: "The subject applications provide an unassisted solution to a problem case where FSLIC assistance may be necessary should other alternatives be sought.... We recommend approval of the subject applications for a voluntary conversion of Hometown. The pros *of a viable unassisted solution and infusion of external capital outweigh the cons* ..." *Id.* at 330 (emphasis added). It is not disputed that plaintiffs made that capital contribution and that New Hometown opened for business on June 30, 1988. In August 1989, FIRREA was enacted and plaintiffs were not able to meet FIRREA's new capital requirements. On June 7, 1990, New Hometown was placed in receivership. In the circumstances of this case, the court finds that restitution is an appropriate remedy and that a return of the $2.05 million capital contribution is a proper measure of the benefit conferred on the government.[9]

recipient of the plaintiffs' cash infusion is equally unsupported. The government has not been the recipient of the contribution in any of the *Winstar*-related cases where restitution has been awarded.

9. Given the court's conclusion that the award of restitution in this case is consistent with the Federal Circuit's holding in *Landmark,* as well as

## B. *Plaintiffs' Claim for Reliance Damages*

Plaintiffs also argue in their briefs before this court that they are also seeking, in addition to their initial $2.05 million contribution, (1) $200,000 attributable to servicing interest payments on the debentures issued to finance the stock purchase and (2) $250,000 in transaction costs. The government contends that these claims, which are in the nature of "reliance damages," were not properly identified during discovery and therefore should not now be allowed. The government contends that before this court, and throughout the discovery process, the plaintiffs stated that they were only seeking restitution of their original investment and lost profits as articulated by Dr. McGuire, the FDIC's expert. In support of its motion, the government directed the court to various documents in its appendix which it contends support its assertion.

The court has reviewed those documents and finds that these documents do not support the government's contention. In particular, the documents include an August 4, 2000 letter from plaintiffs' counsel to government counsel, which, in response to a government request to supplement interrogatory responses, expressly outlines the scope of the plaintiffs' claim of "$200,000 that was used for servicing interest payments ... [and] $250,000 for transaction expenses ..." Def. App. 1521.

In view of this letter, the court is hard-pressed to find how the government has been prejudiced by the plaintiffs' actions during discovery. The government was given ample notice to seek discovery in connection with these claims. The government, therefore, is not entitled to summary judgment with regard to the plaintiffs' reliance claim in the amount of $450,000, on the grounds that plaintiffs failed to identify the claim. Accordingly, the government's motion for sum-

other decisions of this court (*Hansen,* 53 Fed.Cl. at 104), the Ninth Circuit (*Far West,* 119 F.3d at 1367), and the Tenth Circuit (*Resolution Trust Corp.,* 25 F.3d at 1505), the court does not find it necessary to address the government's additional arguments against plaintiffs' restitution claim, which fail to recognize this precedent.

mary judgment to dismiss plaintiff's reliance damage claim is denied.

## C. *Plaintiffs Lack Standing To Directly Recover Expectancy Damages*

■ Finally, plaintiffs contend they are the real party in interest with respect to any expectancy damages suffered by New Hometown, and that the court should award to plaintiffs and not to the FDIC the expectancy damages allegedly established by Dr. McGuire, the FDIC's expert. The government contends that plaintiffs are not entitled to expectancy damages as a matter of law. The government contends that if expectancy damages are an appropriate remedy, and if they can be proven with reasonable certainty, they belong to the bank corporation, and therefore the FDIC as the owner of the bank's claims. According to the government, any recovery to shareholders in the corporation must flow through the corporation, or, here, the FDIC–Receiver. The court agrees.

It is beyond dispute that a cause of action arising from an injury to a corporation belongs solely to the corporation, and that shareholders seeking to pursue those damages may only do so on behalf of the corporation, and only if the corporation has failed to do so itself. "A suit for damages arising from an injury to the corporation can only be brought by the corporation itself or by a shareholder derivatively if the corporation fails to act, ... since only the corporation has an action for wrongs committed against it." *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir. 1987).

Indeed, courts have been mindful of the possibility of double recovery on the part of shareholder-plaintiffs, and have consistently barred lawsuits by shareholders for damages to the corporation for precisely that reason. "The diminution in value of a stockholder's investment is a concomitant of the corporate injuries resulting in lost profits. A fortiori, any redress obtained by the corporations would run to the benefit of their stockholders, and to permit the latter to proceed with those claims would permit a double recovery." *W. Clay Jackson Enters., Inc. v. Greyhound Leasing & Fin. Corp.*, 463 F.Supp. 666, 671 (D.P.R.1979). It is for these reasons that courts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends. "A depreciation or diminution in the value of a shareholder's corporate stock is generally not recognized, however, as the type of direct, personal injury which is necessary to sustain a direct cause of action." *Gaff*, 814 F.2d at 315; *accord Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981); *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 696–97, 1980 WL 13154 (1980).

As the Court of Appeals for the Sixth Circuit explained in *Gaff*, "a diminution in the value of corporate stock resulting from some depletion of or injury to corporate assets is a direct injury only to the corporation; it is merely an indirect or incidental injury to an individual shareholder." *Gaff*, 814 F.2d at 315 (citations omitted); *see also In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 606 (2nd Cir.1994) ("The injury to the Preferred holders' contractual rights to receive dividend and sinking fund payments was not inflicted 'directly' or 'independently of the corporation'.... [T]he injuries to the contract rights of the Preferred holders occurred only as an indirect consequence of those wrongs against Eastern.").

Here, it is clear from Dr. McGuire's analysis that the only way plaintiffs may have suffered, if at all, from a loss of profits *by the thrift* is through a diminution in the value of their stock or through foregone dividends from the thrift, which the cases cited above make clear they cannot pursue. In short, plaintiffs' attempt to directly recover expectancy damages based on what New Hometown would have allegedly earned is nothing more than an attempt to ignore the separate corporate existence of the thrift, and take for themselves what, if proven, rightfully belongs to New Hometown.

Indeed, in a factually similar *Winstar*-related case, this court held that even investor-plaintiffs with privity of contract are not entitled to expectancy damages for the thrift's losses. In *Statesman Sav. Holding Corp. v. United States*, 41 Fed.Cl. 1 (1998),

the court held that shareholder-plaintiffs, who were actual signatories to the contract at issue, not merely third-party beneficiaries, were *not* entitled to direct recovery of expectancy damages. The court reasoned that allowing shareholders who are not liable on corporate liabilities to recover lost profits would circumvent the purpose of creating the corporation and, in fact, would grant them money to which they were not, and never would be, entitled. *Id.* at 16.

Similarly, in *Castle v. United States*, 48 Fed.Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed.Cir.2002), this court held that shareholder-plaintiffs have no right to seek direct recovery of expectancy damages. The court held that any claim for expectancy damages belonged to the bank, and that any benefit the shareholder-plaintiffs received "can only come to them through the bank." *Id.* at 199.

The court also agrees with the government that direct recovery of New Hometown's expectancy damages by plaintiffs would also permit them to circumvent the priority distribution scheme as established by statute and regulation. *See* 12 U.S.C. § 1821(d)(4) (1997); 12 C.F.R. § 360.3 (1997). As shareholders of the insolvent thrift, plaintiffs would be entitled to benefit from a recovery of damages by the thrift, but only in compliance with the requirements set forth by regulation. The regulations provide that the receiver for the thrift may only distribute funds in accordance with a strict priority distribution scheme, which places shareholders behind all other creditors of the thrift. *See* 12 C.F.R. § 360.3 (1997). No money may be paid on a claim unless all claims of higher priority have been satisfied. *Id.*

Plaintiffs cannot simply bypass this law and avoid the mandatory distribution process. Indeed, "the shareholders of each failed thrift will be solely entitled to any surplus remaining after the thrift's creditors and the expenses of administration have been paid. *See* 12 U.S.C. § 1821(d)(11)(A)." *Plaintiffs in all Winstar–Related Cases*, 44 Fed.Cl. 3, 10 (1999).

Plaintiffs contend that the general constraints against shareholder's seeking a lost profit claim should not apply here, because the transfers and receiverships created after New Hometown's closing were invalid and ineffectual in transferring ownership of the thrift's claims to the FDIC. This contention is irrelevant. Plaintiffs never challenged the sufficiency of the receiverships in the appropriate federal district court within the time prescribed. *See* 12 U.S.C. § 1464(d)(2)(E) (2002); 12 U.S.C. § 1821(d)(6)(A) (2002). Accordingly, plaintiffs cannot claim that the FDIC is not the proper party to assert an expectancy damage claim on behalf of New Hometown.

In sum, plaintiffs have failed to show how they are any different from any other shareholder in seeking to assert a lost profits claim. In such circumstances, their lost profits claim must be dismissed as a matter of law.[10]

## III. *THE FDIC'S DAMAGES CLAIMS*

### A. *FDIC's Expectancy Claim*

As discussed above, the FDIC's expectancy damage claim of $40 million is based upon the expert opinion of Dr. McGuire. The government contends that the court should dismiss the FDIC's damage claims on the grounds that Dr. McGuire's opinion is not admissible under Federal Rule of Evidence 702. In particular, the government identifies a number of flaws in Dr. McGuire's analysis, which it argues makes his opinion irrelevant and therefore inadmissible.

The FDIC in response contends that Dr. McGuire's testimony is relevant and that the government's objections go to the reliability of his testimony and therefore its weight. The FDIC therefore argues that this court should not disallow Dr. McGuire's testimony and thus, dismiss its claim. Instead, the FDIC argues that, at a minimum, the court should hold a hearing to determine the sufficiency of Dr. McGuire's testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

---

10. Having concluded that plaintiffs do not have standing to present an expectancy claim for lost profits, it is not necessary for the court to ad-

dress the government's objections to plaintiffs' reliance upon Dr. McGuire's report.

(1993). The court agrees that a *Daubert* hearing is appropriate in this case.

While the government has raised many significant issues regarding Dr. McGuire's testimony, the court is not prepared to dismiss the FDIC's claims based upon the representations of government counsel alone that Dr. McGuire's opinions are not relevant. As the Tenth Circuit explained:

> *Daubert* changed the law of evidence by establishing a 'gatekeeper' function for the trial judges under Federal Rule of Evidence 702. . . . It is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert* . . . . The most common method for fulfilling this function is a *Daubert* hearing . . . . the district court has discretion in the *manner* in which it conducts its *Daubert* analysis. . . .

*Goebel v. Denver and Rio Grande Western Railroad Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citations omitted). *See Daubert*, 509 U.S. at 592, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Given the numerous issues raised by the government with respect to Dr. McGuire's testimony, the court believes that it would be beneficial to conduct a *Daubert* hearing, and examine Dr. McGuire before deciding whether Dr. McGuire's assumptions render his opinion irrelevant, as a matter of law. Without a fuller understanding of his opinion, and questioning by the court and counsel, the court is not prepared at this time to reject Dr. McGuire's testimony and dismiss the FDIC's claim for lack of proof. The government's motions for summary judgment, and to dismiss the FDIC's claim on the grounds that the claim is based on the irrelevant and thus legally insufficient opinion testimony of Dr. McGuire, are stayed pending the outcome of the *Daubert* hearing.[11]

## *CONCLUSION*

Based on the foregoing, the court hereby **GRANTS IN PART** and **DENIES IN PART**

11. Because the court intends to hold a *Daubert* hearing before deciding to reject or consider Dr. McGuire's testimony, it postpones any ultimate ruling on whether the FDIC, through Dr.

Defendant's Motions for Summary Judgment on Plaintiffs' damage claims, filed October 18, 2002. Specifically, the court **GRANTS** summary judgment for the defendant with respect to plaintiffs' lost profits claim and **DENIES** summary judgment with respect to plaintiffs' restitution and reliance claims. Further, the court **STAYS** the Defendant's Motions for Summary Judgment or to Dismiss the FDIC's damage claims, filed April 1, 2002 and October 18, 2002, pending the outcome of *Daubert* hearing.

Seeing no just reason for delay, pursuant to RCFC 54(b), the Clerk of the Court shall enter final judgment for plaintiffs in the amount of $2.05 million in restitution. The Clerk shall also enter final judgment dismissing plaintiffs' lost profits claim.

The parties shall contact the court no later than **Thursday, June 5, 2003** to schedule the *Daubert* hearing. At this time, the court will also discuss a schedule to resolve all of plaintiffs' remaining claims.

McGuire's testimony, is endeavoring to recover damages that may not be allowed, with respect to both the "receivership deficit" and "restitution."