# United States Court of Appeals for the Federal Circuit

04-5036, -5038

SOUTHERN CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION
and SOCAL HOLDINGS, INC.,

Plaintiffs-Appellees,

and

ARBUR, INC., WILLIAM E. SIMON, JR., J. PETER SIMON, and
GEORGE J. GILLESPIE, III (Executors of the Estate of William E. Simon, Sr.),

Plaintiffs-Appellees,

and

ROY DOUMANI, PRESTON MARTIN, and
BEVERLY W. THRALL (Successor to the Claims of Larry B. Thrall),

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

Rosemary Stewart, Spriggs & Hollingsworth, of Washington, DC, argued for plaintiffs-appellees Southern California Federal Savings & Loan Association and Socal Holdings, Inc. With her on the brief was Monica A. Freas. Of counsel was Lesley A. Benn, Milbank Tweed Hadley & McCloy LLP, of Washington, DC.

David S. Cohen, Milbank, Tweed, Hadley & McCloy LLP, of Washington, DC, argued for plaintiffs-appellees Arbur, Inc., William E. Simon, Jr., J. Peter Simon, and George J. Gillespie, III. Of counsel on the brief were Richard C. Tufaro and Lesley A. Benn.

David B. Bergman, Arnold & Porter, LLP, of Washington, DC, argued for plaintiffs-cross appellants. Of counsel on the brief were Melvin C. Garbow, Howard N. Cayne, Michael A. Johnson, and Ida L. Bostian.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Kenneth M. Dintzer, Senior Trial Counsel, Colleen A. Conry, David C. Hoffman, John N. Kane, and Tonia J. Tornatore, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Judge Lawrence M. Baskir

# United States Court of Appeals for the Federal Circuit

04-5036, -5038

SOUTHERN CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION
and SOCAL HOLDINGS, INC.,

Plaintiffs-Appellees,

and

ARBUR, INC., WILLIAM E. SIMON, JR., J. PETER SIMON, and
GEORGE J. GILLESPIE, III (Executors of the Estate of William E. Simon, Sr.),

Plaintiffs-Appellees,

and

ROY DOUMANI, PRESTON MARTIN, and
BEVERLY W. THRALL (Successor to the Claims of Larry B. Thrall),

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: August 22, 2005
_____


Before NEWMAN, MAYER and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA. Dissenting opinion filed by Circuit Judge MAYER.

GAJARSA, Circuit Judge.

The United States appeals two decisions made by the Court of Federal Claims in this Winstar-related case. First, it challenges the court's grant of summary judgment finding the government liable for breach of contract to Arbur, Inc., the Estate of William E. Simon, Sr. (collectively, the "Simon Plaintiffs") and Roy Doumani, Preston Martin, and Beverly W. Thrall (collectively, the "DMT Plaintiffs"). Southern Calif. Fed. Savings & Loan Assoc. v. United States, 52 Fed. Cl. 531 (2002) ("SoCal I"). Second, the government challenges the amount and propriety of damages awarded after trial to Southern California Federal Savings & Loan Association and SoCal Holdings, Inc. (collectively, "the Institutional Plaintiffs") as well as the damages awarded to the Simon Plaintiffs and the DMT Plaintiffs (collectively, the "Individual Plaintiffs"). Southern Calif. Fed. Savings & Loan Assoc. v. United States, 57 Fed. Cl. 598 (2003) ("SoCal II"). The DMT Plaintiffs cross-appeal the court's refusal to award them additional damages based on the government's proposed cost of mitigation. Id. at 641. Because the Court of Federal Claims erred in holding that the Individual Plaintiffs have standing to sue for breach of contract, we vacate the court's judgment finding the government liable to them and awarding them damages based on that liability. Although we agree that the Institutional Plaintiffs are entitled to the categories of damages awarded to them, there are issues with the calculation of those damages that require further fact-finding to fully resolve. Accordingly, we affirm in part and reverse in part the court's award of damages to the Institutional Plaintiffs and remand for further proceedings.

# I.       BACKGROUND

## A.       Overview of Winstar Litigation

This is a Winstar-related case involving claims against the government stemming from Congress' enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73.  FIRREA was passed as part of the government's response to the savings and loan crisis of the 1980s.  Castle v. United States, 301 F.3d 1328, 1332 (Fed. Cir. 2002).  The circumstances surrounding the crisis in the savings and loan industry are well-documented elsewhere, United States v. Winstar Corp., 518 U.S. 839, 843-58 (1996), and therefore we need not recount them in detail here.  An understanding of the government's response to that crisis and the resulting litigation is, however, helpful to appreciating the issues raised by this case, so we begin with a brief overview.

The rise of interest rates in the 1980s caused a number of savings and loan institutions, or thrifts, to become insolvent when the interest rates they were required to pay on new deposits exceeded the income generated from existing mortgages entered into at lower rates.  Castle, 301 F.3d at 1332.  In response, the agency that insured thrift deposits, the Federal Savings and Loan Insurance Corporation ("FSLIC"), and the regulator of all federally insured thrifts, the Federal Home Loan Bank Board ("FHLBB"), sought private investors and healthy thrifts to take over ailing thrifts.  Id.  As an incentive to engage in such mergers, the FSLIC and the FHLBB routinely agreed to afford the acquiring thrifts particular regulatory treatment.  Id. at 1333.

A commonly contracted for benefit involved the treatment of "supervisory goodwill."  Supervisory goodwill was generated by the excess between an ailing thrift's

liabilities assumed by an acquirer and the fair value of its identifiable assets. Winstar Corp. v. United States, 64 F.3d 1531, 1536 (Fed. Cir. 1995) (en banc). The FHLBB permitted the acquiring thrifts to count supervisory goodwill toward the thrift's regulatory capital requirements, despite contrary teachings under generally accepted accounting principles ("GAAP"). Castle, 301 F.3d at 1333. This treatment of supervisory goodwill facilitated satisfaction of the regulatory capital requirements by minimizing or eliminating the need for the acquiring thrifts to obtain additional capital infusions. Id.

The FHLBB and the FSLIC also used a capital credits incentive to encourage mergers with failing thrifts. The capital credits incentive involved FSLIC making a cash contribution to the merged thrift, which contribution could then be accounted for in partial satisfaction of the merged thrift's regulatory capital requirements. Winstar Corp., 64 F.3d at 1536.

FIRREA, which was enacted in 1989, required, among other things, that thrifts maintain core capital of at least three percent of their total assets, and prohibited counting unidentifiable intangible assets, such as supervisory goodwill, toward this capital maintenance requirement. Id. Although the statute did not directly address the treatment of capital credits, concomitant regulations required that capital credits be treated in the same manner as supervisory goodwill. Winstar, 64 F.3d at 1538. As a result of the passage of FIRREA and the promulgation of related regulations, many thrifts that were previously in full compliance with the regulations on capital requirements failed to satisfy the new capital standards and immediately became subject to seizure. Id. Thus, the Winstar litigation was spawned whereby acquirers of the failing thrifts alleged that the government's enactment and implementation of

04-5036, -5038                           4

FIRREA constituted a breach of the contracts promising thrifts particular regulatory treatment. Castle, 301 F.3d at 1333.

B.    The SoCal Transaction

In 1986, the Individual Plaintiffs[1] responded to the government's solicitation of purchasers for the failing Southern California Savings and Loan Association ("Old Southern"). SoCal I, 52 Fed. Cl. at 445. The Individual Plaintiffs proposed to form and personally capitalize a holding company to be named SoCal Holdings, Inc. ("SCH"). Id. SCH would in turn purchase Old Southern and form a new savings and loan association. Id. Upon government approval, the new association, a wholly-owned subsidiary of SCH named Southern California Federal Savings and Loan Association ("SoCal"), would acquire all the assets and liabilities of Old Southern. Id. at 446. The government approved the acquisition proposal and, on April 30, 1987, a series of agreements were entered into to complete the transaction.

Three of those agreements/documents are most relevant to the current litigation. The Assistance Agreement was the primary document governing the transaction and it was entered into by SCH, as the acquirer of Old Southern, SoCal, and FSLIC. In conjunction with the execution of the Assistance Agreement, the FHLBB issued a Forbearance Letter addressed to Preston Martin as Chairman of the Board and Chief Executive Officer of SCH. The Forbearance Letter included the FHLBB's promise that SoCal could depart from GAAP in accounting for its capital credits and its supervisory

---

[1]    In addition to the Individual Plaintiffs, Gerald L. Parsky was also a significant investor in SCH and the purchase of Old Southern. Southern Calif. Fed. Savings & Loan Ass'n v. United States, 52 Fed. Cl. 444, 447 (2002). For unexplained reasons, Parsky was not a party to the complaints filed in this action. Id. Parsky's attempts to file a separate claim were dismissed as time-barred. Id. at 448. The absence of Parsky is not material to this action.

goodwill. Finally, the Regulatory Capital Maintenance Agreement ("RCMA") was entered into by SCH, the Individual Plaintiffs, SoCal, and the FSLIC. Section 1 of the RCMA required SCH to maintain the regulatory capital of SoCal at the level specified by the applicable regulations and stated that the FSLIC capital credit would be includable as capital in order to meet that requirement. The RCMA also obligated the Individual Plaintiffs to "guarantee the performance of [SHC] and [SoCal] under § 1, provided that . . . the personal obligations of the [Individual Plaintiffs] under said guarantees shall not exceed $5,000,000 in the aggregate." Execution of the RCMA was an express condition to FSLIC's obligations under the Assistance Agreement.

By 1989, SoCal's financial situation had improved greatly. SoCal II, 57 Fed. Cl. at 607. Its MACRO/CAMEL rating[2] had moved from a 4 to a 3. Id. Despite a tightening of the market, a decline in mortgage originations, and increased competition from other California thrifts, SoCal had grown from approximately $900 million at the time of the acquisition by SCH to approximately $2.3 billion by 1989. Id.

With the changes in capital requirements wrought by FIRREA, SoCal became a troubled institution. Id. at 608. After FIRREA took effect, SoCal's capital ratio dropped to 1.45%, substantially below its regulatory capital requirement, and its MACRO/CAMEL rating was dropped to a 4. Id. at 609. The Court of Federal Claims found that the drop

---

[2] Federal regulators rate thrifts according to the effectiveness of their management and the Board of Directors, their asset quality, capital adequacy, asset/liability and risk management, and earnings (operations). SoCal II, 57 Fed. Cl. at 605. Prior to FIRREA, the rating system was denominated by the anagram MACRO and after FIRREA, the anagram CAMEL (capital, assets, management, earnings, liability) was used. Id. Using a scale of 1-5, with 1 being the highest rating and 5 being the lowest, the MACRO/CAMEL rating is considered an accurate description of the condition of a thrift at a given point in time. Id. at 607.

in SoCal's regulatory capital negatively affected SoCal's retail and wholesale customer base, its long-term strategic plans, and its cost of acquiring operation capital. Id. at 610.

In an effort to comply with FIRREA, SoCal disposed of assets, which meant that it required less capital as a percentage of assets. Id. at 612. The thrift could not shrink fast enough, however, so it was forced to raise additional capital to become compliant. Id. In 1992, SCH issued $48 million in senior debt to Arbur, Inc. and two new investors. Id. at 614. In addition to receiving interest payments, Arbur and the new investors received shares of a newly-created Class A common stock and the original common stock, which previously had no class designation, was converted to Class B common stock. Id. The effect of the 1992 recapitalization was to dilute the ownership of the Individual Plaintiffs from 100% of the common stock before the transaction to 51.36% after the transaction. Id. The 1992 recapitalization brought SoCal into compliance under the FIRREA capital standards and raised its MACRO/CAMEL rating to a 3. Id. at 615. Following the consummation of this transaction, the government terminated the RCMA. Id.

By November 1994, SoCal was again on the brink of failure, having been assigned a MACRO/CAMEL rating of 5. Id. at 616. The Court of Federal Claims found that SoCal's troubles were principally caused by FIRREA, in part because of the increasingly stringent capital requirements imposed as the act went fully into effect. Id. at 615. A second recapitalization was executed in June 1995, with the 1992 capital providers as the sole participating entities. Id. at 617. The senior notes issued in 1992 were returned to SCH and contributed to the capital of SoCal. Id. Additionally, the two outside investors from 1992 purchased $10 million in new debt, with an increasing

interest rate. Id. SCH also issued a $2 million senior note to Arbur, Inc. Id. In equity, SCH cancelled for no consideration the original shares issued to the Individual Plaintiffs and exchanged the preferred stock issued in 1992 for common stock. Id. Finally, SCH issued three new series of preferred stock to the 1992 investors, of which all three series required quarterly dividend payments. Id. For the equity, SCH received $48.5 million. Id. As a result of this transaction, the ownership interest originally bargained for by the Individual Plaintiffs was extinguished. Id.

After the 1995 recapitalization, the health of SoCal gradually improved. The Court of Federal Claims found that as of December 31, 1996, "[t]he effects of the Government's breach had thus been mitigated by the considerable efforts of the Institutional and Individual Plaintiffs and, of course, by the infusion of approximately $100 million in tangible capital. SoCal was finally out of the very deep hole it had been in for years." Id. at 618.

C. Proceedings Before the Court of Federal Claims

The Institutional Plaintiffs and the Individual Plaintiffs filed suit in the Court of Federal Claims to recover damages they incurred by the enactment of FIRREA. In SoCal I, the court addressed issues of the government's liability. In response to a summary judgment motion on behalf of all the plaintiffs, the government admitted that it had an express contract with the Institutional Plaintiffs, but argued that the Individual Plaintiffs lacked standing because they did not have privity of contract. SoCal I, 52 Fed. Cl. at 541. The court found that the government's execution of the Assistance Agreement, the RCMA and the FHLBB implementing resolutions all on the same day evidenced its intent to contract with all the plaintiffs. Id. at 542. Interpreting the merger

clause of the Assistance Agreement to support this conclusion, the court found that the transactional documents created one overall contract to which the Individual Plaintiffs, as well as the Institutional Plaintiffs, were party. Id. at 543. Accordingly, the court held that the Individual Plaintiffs had standing to sue and granted the plaintiffs' summary judgment motion finding the government liable for breach of the overall contract. Id. at 549.

After a two month trial, the Court of Federal Claims issued an opinion awarding damages to the plaintiffs. The court awarded the Institutional Plaintiffs a total of $65,397,821.41 for "wounded bank" damages and "cost of replacement capital" damages. SoCal II, 57 Fed. Cl. at 601. Wounded bank damages, which the court classified as a type of reliance damages, compensate for the costs incurred by the thrift because of its status as a "troubled" or under-capitalized institution. Id. at 624. Such costs include higher costs of funds, higher insurance and regulatory premiums and assessments, and extra attorney and consultant fees to interface with the regulators. Id. Damages for cost of replacement capital, which the court also classified as a form of reliance damages, compensate for the money spent by the thrift to replace the goodwill lost as a result of the government's breach. Id. In regards to the Individual Plaintiffs, the Court of Federal Claims awarded a total of $22,448,293.75 in "dilution damages". Id. at 601. Under the dilution theory, which the court classified as a form of restitution damages, id. at 623, the Individual Plaintiffs were awarded either the value of the breached thrift at a given point in time or a dollar amount corresponding with the cost of replacing their equity in the breached thrift, id. at 634.

Final judgment in the case was entered on September 10, 2003. The government filed a timely Notice of Appeal and now challenges the holding that the Individual Plaintiffs have standing to sue and the amount of damages awarded to both the Individual Plaintiffs and the Institutional Plaintiffs. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II.    DISCUSSION

This court reviews the Court of Federal Claims' grant of summary judgment under a de novo standard of review. Winstar, 64 F.3d at 1539. Whether a plaintiff has standing to bring suit is likewise a question of law, reviewed de novo. Consol. Edison Co. v. Richardson, 233 F.3d 1376, 1379 (Fed. Cir. 2000). Standing is a threshold jurisdictional issue that implicates Article III of the Constitution.[3] Castle, 301 F.3d at 1336.

The existence or non-existence of a contract is a mixed question of law and fact; contract interpretation is a question of law, reviewed de novo. Id. Questions regarding whether a breach of contract caused certain damages are questions of fact reviewed under the clear error standard. Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1356 (1999). A finding is clearly erroneous when, despite some supporting evidence, "the reviewing court on the entire evidence is left with the definite and firm

---

[3]    The Court of Federal Claims suggested, SoCal I, 52 Fed. Cl. at 543, and the DMT Plaintiffs reiterate on appeal, that the government conceded that the Individual Plaintiffs are in privity of contract and therefore have standing to sue. Although the support for this assertion is weak, it is not necessary to address this argument because standing and privity of contract with the government are questions of subject matter jurisdiction that cannot be conceded to by a party. Chancellor Manor v. United States, 331 F.3d 891, 899 (Fed. Cir. 2003).

conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

A. Standing of the Individual Plaintiffs

A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim. Anderson v. United States, 344 F.3d 1343,1351 (Fed. Cir. 2003); see also United States v. Algoma Lumber Co., 305 U.S. 415, 421 (1939) (declining to presume that the government's actions gave rise to contractual obligations when the government was not a named party to the contract in suit). Not only is privity a fundamental requirement of contract law, but it takes on even greater significance in cases such as this, because the "government consents to be sued only by those with whom it has privity of contract." Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984). Limited exceptions to that general rule have been recognized when a party standing outside of privity stands in the shoes of a party within privity. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Here, the Court of Federal Claims applied an expansive reading to the terms of the agreements at issue to conclude that the Individual Plaintiffs had standing to recover their claimed dilution damages. First, the Court of Federal Claims found that the Assistance Agreement, the RCMA and the FHLBB implementing resolutions should properly be considered components of one overall contract to which the Individual Plaintiffs were a party. SoCal I, 52 Fed. Cl. at 542. Accordingly, the court treated the government's promises regarding the treatment of supervisory goodwill and capital credits as running to all parties to the overall contract and determined that the Individual Plaintiffs had standing to recover. Id. In finding one overall contract, the court relied

primarily on its interpretation of two clauses of the Assistance Agreement: the "Sole Benefit" clause and the "Entire Agreement" clause.

The Sole Benefit clause of the Assistance Agreement reads:

> It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

The government argued that the effect of the Sole Benefit clause was to limit the benefits of the Assistance Agreement to the Institutional Plaintiffs as parties to the contract. The Court of Federal Claims rejected this argument on the grounds that reading the Sole Benefit clause in that manner would effectively nullify the Entire Agreement clause. SoCal I, 52 Fed. CL. at 541.

The Entire Agreement clause of the Assistance Agreement reads in pertinent part:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Conversion, the Acquisition or this Agreement issued by [FHLBB] or [FSLIC] in connection with the approval of the Conversion, the Acquisition and this Agreement.

On its face, the Entire Agreement clause specifically incorporates the Forbearance Letter from the FHLBB and the government does not contest that the letter should be considered part of the Assistance Agreement. SoCal I, 52 Fed. Cl. at 535. The Court of Federal Claims interpreted the Entire Agreement clause to also incorporate the RCMA. Id. at 541. Accordingly, the court determined that there was a direct conflict between

the expansive terms of the Entire Agreement clause and the limitations of the Sole Benefit clause. Id. at 541. In order to avoid reading out of the contract the Entire Agreement clause, the court determined that the Sole Benefit clause was unenforceable. Id. at 542.

The Court of Federal Claims' reading of the Entire Agreement clause violates one of the basic precepts of contract interpretation – it does not comport with the plain meaning of the clause. C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof."); see also Lowber v. Bangs, 69 U.S. 728, 736 (1865) ("The construction to be put upon contracts of this sort depends upon the intentions of the parties, to be gathered from the language of the individual instrument." (citation omitted)); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993) ("Contract interpretation begins with the plain language of the agreement."). The Entire Agreement clause specifically incorporates only a) interpretations or understandings agreed to in writing by the parties; and b) resolutions or letters from the FHLBB or the FSLIC. The RCMA does not constitute either of the types of documents integrated into the Assistance Agreement. It is a separate contract that involves additional parties and distinct promises, including its own Entire Agreement clause. The RCMA does not purport to either interpret the Assistance Agreement or embody an understanding of the Assistance Agreement and there is no question that the RCMA is not a resolution or letter from the government regulators.

Not only does the Entire Agreement clause not reference the RCMA, the definition section of the Assistance Agreement identifies the RCMA as a separate

agreement to be executed in substantially the form provided for in Exhibit A to the Assistance Agreement. Although the existence of the RCMA is acknowledged by the Assistance Agreement, the RCMA itself is neither explicitly incorporated into the Assistance Agreement nor implicitly incorporated by the Entire Agreement clause. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (1996) (stating that the parties may expressly incorporate documentary or other evidence into a contract via an integration clause); see also Winstar, 518 U.S. at 861-68 (giving effect to contract integration clauses incorporating specific extrinsic documents as part of the contract). Furthermore, far from indicating that the Assistance Agreement and the RCMA should be read as constituting one contract, the plain language of the Sole Benefit clause and the Entire Agreement clause evidences the parties' intent to limit the scope of the Assistance Agreement to its specified terms. Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (holding that an integration clause conclusively establishes that the integration is total and prohibits the use of external evidence to add to or modify the terms of a written agreement).

In support of the Court of Federal Claims' expansive interpretation of the scope of the Assistance Agreement, the DMT Plaintiffs cite to a number of cases that purportedly establish that it is proper to read related instruments as constituting one single contract. The non-binding case law to which the DMT Plaintiffs cite does not stand for the proposition claimed, namely that a party to one contract can be deemed a party to a related contract simply because the separate contracts constitute components of one transaction. To the contrary, the cases cited apply a basic rule of contract interpretation to the effect that "where several instruments, executed contemporaneously or at

different times, pertain to the same transaction, they will be read together, even though they do not expressly refer to each other." Kurz v. United States, 156 F. Supp. 99, 104 (S.D.N.Y. 1957); see also Peterson v. Miller Rubber Co. of New York, 24 F.2d 59, 62 (8th Cir. 1928); Cf. Hampton Roads Shipping Assoc. v. Int'l Longshoremen's Assoc., 597 F. Supp. 709, 716 (E.D. Va. 1984) (suggesting that several writings "will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction;" despite the language used, the analysis undertaken by the court focused only on the meaning of a term used in multiple agreements). The issue before the Court of Federal Claims was not the construction of a common term, however, but rather the existence of an agreement between the government and the Individual Plaintiffs. The cases cited by the DMT Plaintiffs are not persuasive authority for ignoring the terms of the Assistance Agreement and extending the benefits of the contract to the Individual Plaintiffs who were not party to that contract.

The Court of Federal Claims premised its finding that the Individual Plaintiffs have standing to sue on its determination that there was one overall contract to which the Individual Plaintiffs were "not ancillary, as the Government urges, but rather central to this transaction. The thrift would have failed – and the acquisition never have occurred – but for the Individual Plaintiffs." SoCal I, 52 Fed. Cl. at 542.[4] In so finding, the court focused on evidence suggesting that the Individual Plaintiffs initiated the conversion and acquisition processes prior to incorporating SCH and that at least some of them negotiated directly with the government in arranging the transaction. Id. at 533.

---

[4] It is noteworthy that the Court of Federal Claims did not find that the status of the Individual Plaintiffs as signatories to the RCMA was sufficient to allow them to recover damages. The terms of the RCMA, and their inability to support the Individual Plaintiffs' claims for damages, are addressed in the following subsection.

Furthermore, the evidence showed that the government was aware both that the Individual Plaintiffs would be supplying the money used to rehabilitate SoCal and that the Individual Plaintiffs would be the primary shareholders of SCH. Contrary to the conclusion of the Court of Federal Claims, however, these roles of negotiator and shareholder do not bring the Individual Plaintiffs into privity of contract with the government in regards to the Assistance Agreement entered into with SCH and SoCal.

The court's emphasis on the Individual Plaintiff's involvement in the conversion and acquisition processes fails to acknowledge that a corporation is generally considered to be a separate legal entity from its shareholder – a concept well grounded in state law. Wenban Estate, Inc. v. Hewlett, 227 P. 723, 731 (Cal. 1924). Here, it is the law of California that governs the construction of the Assistance Agreement as specifically provided for in the "Governing Law" clause. Under California law, the corporate entity may be disregarded in order to prevent fraud, to protect third persons or to prevent a grave injustice, including an injustice to shareholders. Cooperman v. Unemployment Insur. Appeals Bd., 122 Cal. Rptr. 127, 131 (Cal. App. 1975). In order for the acts and obligations of a corporation to be legally recognized as those of a particular person,

> the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

Minifie v. Rowley, 202 P. 673, 676 (Cal. 1921). Here, there is no allegation that the Individual Plaintiffs had the necessary unity of interest with SCH and its subsidiary

SoCal or that continued recognition of the corporate form would work a grave injustice. Accordingly, there is no justification for the Court of Federal Claims' disregard of the corporate structure invoked by the Individual Plaintiffs in facilitating the acquisition and conversion of Old Southern. See Aladdin Oil Corp. v. Perluss, 41 Cal. Rptr. 239, 245 (Cal. App. 1964) ("Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. The alter ego doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations.")

This court has regularly acknowledged the legal distinction between a corporation and its shareholders and rejected claims by shareholders to assert a breach of contract claim on behalf of the corporation. First Hartford Corp., 194 F.3d at 1289 (holding that a shareholder lacks privity of contract to sue the government for Winstar damages when only the corporation entered into an agreement with the FDIC); FDIC v. United States ("Karnes"), 342 F.3d 1313, 1318 (Fed. Cir. 2003) (same); Castle, 301 F.3d at 1339 (dismissing shareholders' claims on the grounds that they had not established that the government had entered into a contract with them as individuals independent of their status as shareholders); Cain v. United States, 350 F.3d 1309, 1317 (Fed. Cir. 2003) (stating that the holding that there was no contract between the government and the shareholders of a thrift was consistent with this court's prior cases addressing the issue). We have done so, in part, out of the recognition that "one of the principal motivations behind utilizing the corporate form is often the desire to limit the risk of ownership to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation." First Hartford, 194 F.3d at 1289. Having

chosen to limit their personal liability by adopting a corporate form, we have refused to allow shareholders to rely on their involvement in the negotiation process or their role in funding a transaction to alter their chosen legal status. See Karnes, 342 F.3d at 1319 ("Neither [the government's] knowledge, the supplying of the new capital, or the Lee's position as stockholders in Karnes, made them parties to those arrangements."); Cain, 350 F.3d at 1315-17 (holding that the government's communication and negotiation with shareholders did not establish that the shareholders were parties to the contracts entered into between the government and the corporation). We reached a different result in Lavan v. United States, 382 F.3d 1340, 1349 (Fed. Cir. 2004), by focusing on factual distinctions between Karnes and Cain and the case presented in Lavan. Specifically, we held that the shareholders were so critical to the conversion transaction that they, rather than the corporation, were essentially the direct purchasers of the converted federally-insured institution. Id. In Lavan, however, unlike here, there was no indication that the parties identified state law intended to govern the contract. The factual analysis of Lavan does not address the legal requirements imposed here, namely the strictures of California law mandating a distinction between a corporation and its shareholders.

Not only do the Individual Plaintiffs not have standing in this case based on their status as shareholders, but we must also be mindful of the possibility that allowing such a suit would create an impermissible double recovery. The purpose of damages for breach of contract is generally to put the wronged party in as good a position as he would have been had the contract been fully performed. See Cal. Code § 3300 (2005); Restatement (Second) of Contracts § 347 cmt. a (1981). In light of this general

purpose, a wronged party is typically not allowed to recover twice for the same harm, here a breach of contract. See EEOC v. Waffle House, Inc., 534 U.S. 279, 297 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual.") (internal citations omitted); see also Chou v. Univ. of Chicago, 254 F.3d 1347, 1365 (Fed. Cir. 2001). This limitation applies even where claims exist under both contract and tort, see, e.g., Ostano Commerzanstalt v. Telewide Sys., Inc., 880 F.2d 642, 649 (2d Cir. 1989), or where a claim exists under a statutory provision and under common law, see, e.g., Waffle House, 534 U.S. at 297. California, by statute, limits damages in contract cases to those that a party "could have gained by the full performance thereof on both sides," unless additional damages are provided for by statute. Cal. Code § 3358 (2005). Since the compensation awarded the corporation flows to its shareholders through the value of their stock, to allow individuals to recover both through the corporation and as individuals would be to allow duplicative recovery. See Gaff v. FDIC, 814 F.2d 311, 315 (6th Cir. 1987) ("a diminution in the value of corporate stock resulting from some depletion of or injury to corporate assets is a direct injury only to the corporation; it is merely an indirect or incidental injury to an individual shareholder"); see also Vinci v. Waste Mgmt. of Alameda County, Inc., 80 F.3d 1372, 1375 (9th Cir. 1996) (holding that a shareholder of a corporation cannot recover directly for antitrust violations, because such would amount to double recovery.); Stein v. United Artists Corp., 691 F.2d 885, 895-96 (9th Cir. 1982) (prohibiting creditors and guarantors of a corporation from recovering separately on antitrust claims, because double recovery would result); Hometown Fin., Inc. v. United States, 56 Fed. Cl. 477, 486-87 (2003) (explaining that a shareholder suit against the government for breach of

contract with a failed thrift presented serious risk of impermissible double recovery). The Individual Plaintiffs are not parties to the Assistance Agreement and therefore they do not have standing to sue the government for a breach of the promises made in that agreement.

B.      The Ability of the Individual Plaintiffs to Recover Under the RCMA

Although the Individual Plaintiffs were not party to the Assistance Agreement, they were in contractual privity with the government under the RCMA. The question becomes, then, whether they are entitled to the damages they seek based on the terms of that contract.

There are four components of the RCMA relevant to this determination. First, Recital A indicates that "the [Individual Plaintiffs] collectively own 97.5 percent of the outstanding voting securities of [SCH] and control [SCH]." Second, Recital G and § 1 include the government's promise that SCH and SoCal will be able to account for $217.5 million in capital credits as part of its regulatory capital. Third, the RCMA states that "so long as [SCH] shall be obligated pursuant to § 1, the [Individual Plaintiffs], severally in proportion to their initial ownership of the common stock of [SCH] as reflected in the percentages set forth opposite their signatures below, hereby guarantee the performance of [SCH] and [SoCal] under § 1." Finally, the RCMA requires that the Individual Plaintiffs, or their successors who have assumed their shares of the guarantee and have not been objected to by the FSLIC, shall "collectively own not less than a majority of the outstanding voting power of [SCH]."

The DMT Plaintiffs argue that the incorporation of the capital credit promise into the terms of the RCMA is sufficient to uphold the Court of Federal Claims' award of

damages.  This argument fails to recognize, however, that the damages for which the Individual Plaintiffs seek to recover, namely the dilution and extinguishment of their ownership interests in SCH, were not caused by the obligations they incurred in the RCMA.  The RCMA did not require that the Individual Plaintiffs invest in SCH.  To the contrary, Recital A indicates that the incorporation, ownership and control of SCH were established prior to the parties entering into the RCMA.  At the most, the RCMA obligated the Individual Plaintiffs to collectively contribute to SCH and SoCal an additional $5 million in the event that SCH and SoCal did not maintain SoCal's regulatory capital at the required level.  There is no indication that the government ever enforced this guarantee or that the Individual Plaintiffs ever complied with its terms.

Under the terms of the agreement, even if we assume that the passage of FIRREA constituted a breach of the RCMA, the Individual Plaintiffs are not entitled to recover the damages they seek under any applicable theory of contract damages. There are three forms of damages typically awarded to compensate for breach of a contract: expectation damages, restitutionary damages, and reliance damages.  Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 (Fed. Cir. 2004).  Expectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position as he would have been in had the contract been performed. Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."  Id.  Restitutionary damages restore the non-breaching party to the position he would have been in had there never been a contract to breach.

Landmark Land Co., Inc. v. United States, 256 F.3d 1365, 1372 (Fed. Cir. 2001). Such damages, however, are not recoverable for actions taken voluntarily, beyond the obligations of the contract. Id. at 1375 ("the law is well settled . . . that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations"). Reliance damages are damages designed to compensate a plaintiff for foreseeable loss caused by reliance on the contract. Id. at 1369. The Individual Plaintiffs are not entitled to recover dilution damages under any of these theories of recovery.

As a preliminary matter, it is worth noting that there are no terms in the RCMA that require the Individual Plaintiffs to raise capital for SCH and SoCal by diluting their ownership interest in order to issue equity to new investors. At the most, the RCMA obligates the Individual Plaintiffs to contribute an additional $5 million to the operation of SCH and SoCal. Accordingly, based on the unambiguous terms of the RCMA, the Individual Plaintiffs' loss of their ownership interests was neither the foreseeable result of nor caused by the government's breach of the RCMA and therefore dilution damages cannot be awarded as a form of expectation damages. Similarly, because the Individual Plaintiffs were not required to dilute their ownership interests, but voluntarily chose to do so, they cannot recover restitution for their actions. Furthermore, because the recapitalizations did not occur until after FIRREA was passed, it is axiomatic that the dilution of the Individual Plaintiffs' ownership interest was not undertaken in reliance on the government's promises regarding accounting for capital credits and supervisory goodwill. Accordingly, they do not have grounds to recover reliance damages. Finally, because the initial investment in SCH occurred prior to the execution of the RCMA, the

Individual Plaintiffs cannot point to that undertaking as grounds to recover under any of the applicable theories.

The Individual Plaintiffs do not have standing to sue under the Assistance Agreement and they cannot recover the damages they seek under the RCMA. The decision of the Court of Federal Claims holding the government liable to the Individual Plaintiffs and awarding damages to these parties is vacated. In light of this holding, it is not necessary to address the government's challenge to the amount of damages awarded to the Individual Plaintiffs or the DMT Plaintiffs' cross-claim for additional damages.

B.      The Award to the Institutional Plaintiffs of the Replacement Cost of Capital

The Court of Federal Claims awarded the Institutional Plaintiffs $29,436,229.44 as compensation for the costs the Institutional Plaintiffs incurred in replacing the goodwill phased out by FIRREA.[5] SoCal II, 57 Fed. Cl. at 631. In association with the 1992 recapitalization, the court awarded the Institutional Plaintiffs $5,218,000 in transaction costs and expenses and $556,000 for the payment of dividends required by the issuance of the senior preferred stock in 1992. Id. In association with the 1995 recapitalization, the court awarded $714,374.04 in transaction costs and expenses, $3,508,000 in interest costs mandated by the recapitalization, and $19,439,855.40 for the payment of the accumulated dividends on all outstanding preferred stock issued in 1995. Id. The government does not challenge the $5,932,374.04 awarded for transaction costs and expenses, but contests the remainder of this award.

---

[5]     The court classified the awards to the Institutional Plaintiffs as a form of reliance damages, but they are more accurately considered a measure of expectation damages, designed to give the Institutional Plaintiffs the benefit of their bargain. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1374 (Fed. Cir. 2003).

The government challenges the Court of Federal Claims' award of replacement costs of capital on two grounds. First, it argues that the holding of California Federal Bank, FSB v. United States, 245 F.3d 1342 (Fed. Cir. 2001) limits any award for the replacement of goodwill to the transaction costs incurred in raising the replacement capital. Second, it finds error in the court's failure to account for any earnings that flowed to SoCal and SCH by having cash on-hand rather than nontransferable, amortizing goodwill.

The government reads California Federal to limit any award for replacing goodwill with real capital to the transaction costs incurred. Cal. Fed., 245 F.3d at 1350. This interpretation of California Federal unreasonably expands the scope of the issue decided in that case. The court in California Federal did not hold that all awards for the replacement costs of capital should be limited to transaction costs, but simply that the Court of Federal Claims had not erred in rejecting the testimony of California Federal's expert, which would have established California Federal's right to damages in excess of its transaction costs. Id. The expert testimony that the court had found incredible was a claim that it cost the thrift nearly a billion dollars to replace $390 million of goodwill. Id. The decision in California Federal to limit the award of replacement costs of capital to the transaction costs incurred does not mandate a similar result in this case where the Institutional Plaintiffs presented very different, carefully itemized evidence in support of their claim.

The government's second challenge to the Court of Federal Claims' award of damages has more merit. As this court held in LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003), "payment of a return on capital reflects

04-5036, -5038                  24

the cost of capital. However, in determining damages the benefits of that capital must be credited, as mitigation due to the replacement of goodwill with cash." In the case at hand, the Institutional Plaintiffs' expert acknowledged that his damage calculation was a complete accounting of all costs that could be definitively measured, but that it did not include an offset for the income generated by the replacement capital because that income was not precisely measurable. In crafting its damages award, the Court of Federal Claims granted the Institutional Plaintiffs the entire amount established by their expert, which means that the award does not reflect the benefit of the capital that the Institutional Plaintiffs received. SoCal II, 57 Fed. Cl. at 631.

The government suggests that it was grave error for the Court of Federal Claims to fail to offset the damages award by the amount of benefit the Institutional Plaintiffs received from owning cash rather than goodwill. The true gravity of the error is unclear from the record established, however, and it is not possible to ascertain whether the Institutional Plaintiffs adduced sufficient evidence from which the court could "make a fair and reasonable approximation of the damages" properly accounting for the benefits obtained. See Blue Bonnet, 266 F.3d at 1357. Accordingly, this issue is reversed and remanded to the Court of Federal Claims for further fact-finding in order to determine if a complete determination of damages can be reached.

D.   The Award to the Institutional Plaintiffs for Wounded Bank Damages

The Court of Federal Claims awarded the Institutional Plaintiffs $35,961,591.97 in damages for wounded bank expenses, i.e. increases in its costs due to being identified as a "troubled" institution. SoCal II, 57 Fed. Cl. at 628. The court calculated the amount of wounded bank damages as follows: $32,320,000 for excess cost of

funds; $278,258.55 for legal, consulting and filing fees; $64,879.42 for FHLBB Collateral delivery fees; $2,509,000 for FDIC deposit insurance premiums; and $789,454 in excess assessments paid to the government's Office of Thrift Supervision. Id. The government challenges the court's award of wounded bank damages on the grounds that: (i) as a matter of law, the damages are too remote from the breach to be recoverable; (ii) the finding that the damages were caused by the breach was clearly erroneous; and (iii) the measurement of excess costs of funds was based on flawed expert testimony.

The government's first challenge to the Institutional Plaintiffs' claim for wounded bank damages is that it is too remote as a matter of law. The government argues that in order to reach the claimed wounded bank damages an extended chain of causation must be followed that indicates that the Institutional Plaintiffs are seeking consequential damages beyond those typically permitted in contract actions. See Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021-23 (Fed. Cir. 1996). This argument raises the question whether the increased costs of funds were reasonably foreseeable at the time the contract was entered into. Contrary to the government's characterization, foreseeability is a question of fact reviewed for clear error. Bluebonnet, 266 F.3d at 1355. The government does not, however, address why it would be unforeseeable that the loss of the contracted-for benefits would impact the health of SoCal and increase its costs of doing business, particularly since the regulatory treatment at issue was designed to foster the recovery of ailing thrifts. The government also fails to acknowledge this court's approval of similar damage theories in Winstar-related cases. See Bluebonnet, 266 F.3d at 1355-56 (approving a thrift's claim to recover the increase

in financing costs caused by the passage of FIRREA); <u>Glendale Fed. Bank, FSB v. United States</u>, 378 F.3d 1308, 1311-12 (Fed. Cir. 2004) (affirming the trial court's award of wounded bank damages to compensate a thrift for the higher costs of conducting its general business after FIRREA). The government's argument that wounded bank damages are not recoverable as a matter of law is without merit.

The government's second challenge to the award of wounded bank damages is an attack on the Court of Federal Claims' determination that the damages were caused by FIRREA. "Causation is . . . a question of fact reviewed under the clear error standard." <u>Bluebonnet</u>, 266 F.3d at 1356. The Court of Federal Claims concluded that FIRREA was the principal cause of SoCal's recapitalization and was the substantial factor in SoCal's incurring higher costs of funds after the breach. <u>SoCal II</u>, 57 Fed. Cl. at 616. In so holding, the court considered and discounted evidence regarding the impact on SoCal's operations of the recession in California, the massive decline in real estate values, losses stemming from the Los Angeles riots following the Rodney King trial and the Northridge earthquake. <u>Id.</u> The government does not attack this fact finding directly, but attempts to undermine the factual conclusions on which it was based. The government asserts that the breach did not cause SoCal to fall out of capital compliance, did not cause negative publicity for SoCal, did not disrupt SoCal's planned branch expansion, did not cause SoCal's interest rate risk and hedging problems, and did not cause an increase in SoCal's funding costs. Although there is certainly merit to the government's claim that SoCal was a relatively weak institution prior to the passage of FIRREA, the government is not persuasive in arguing that because of that weakness FIRREA had no effect on the thrift's operations. There is

certainly evidence to support the government's claims, but there is also countervailing evidence consistent with the court's conclusions. At its base, the government's causation argument is nothing more than a request that this court reweigh the evidence heard by the Court of Federal Claims and come to a different conclusion. The government has not established that it was clear error for the court to conclude that the passage of FIRREA lead to specific and quantifiable increases in the thrift's cost of doing business.

Finally, the government challenges the evidentiary support for the court's award of wounded bank damages. Specifically, the government argues that the testimony of Dr. Hartzog, the Institutional Plaintiffs' expert on wounded bank damages, was procedurally flawed and that it lacked credibility. The government also asserts that it was penalized by the court for not presenting an alternative damages model. Neither of the government's arguments have merit. The government presented its challenges to the credibility of Dr. Hartzog's testimony at trial and, despite those challenges, the Court of Federal Claims found Dr. Hartzog's testimony to be "entirely accurate and credible" and supported by other experts and witnesses. SoCal II, 57 Fed. Cl. at 630. The government's invitation to overturn the court's credibility determination is not well-founded. Syntex LLC v. Apotex, Inc., 407 F.3d 1371, 1384 (Fed. Cir. 2005) ("Credibility determinations are the type of factual determinations that are best left to the fact finder, the trial court."). Nor is there merit to the government's argument that it was penalized for failing to present an alternative damage theory, because the court simply indicated that the government's failure to present such a model undermined its efforts to

challenge the model presented by the Institutional Plaintiffs. The Court of Federal Claims' award of wounded bank damages is affirmed.

## III. CONCLUSION

For the foregoing reasons, we vacate both the determination of the Court of Federal Claims holding that the Individual Plaintiffs had standing to sue and the award of damages based on that suit. We reverse the court's award of replacement costs of capital and remand for further proceedings consistent with this opinion. Finally, we affirm the court's award of wounded bank damages.

<u>AFFIRMED IN PART, REVERSED IN PART, VACATED AND REMANDED.</u>

## IV. COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

04-5036, -5038

SOUTHERN CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION
and SOCAL HOLDINGS, INC.,

Plaintiffs-Appellees,

and

ARBUR, INC., WILLIAM E. SIMON, JR., J. PETER SIMON, and
GEORGE J. GILLESPIE, III  (Executors of the Estate of William E. Simon, Sr.)

Plaintiffs-Appellees,

and

ROY DOUMANI, PRESTON MARTIN, and
BEVERLY W. THRALL (Successor to the Claims of Larry B. Thrall),

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

MAYER, <u>Circuit Judge</u>, dissenting in part.

The combined content of the Regulatory Capital Maintenance Agreement ("RCMA"), the Assistance Agreement, and the Federal Home Loan Bank Board ("FHLBB") implementing resolutions, all signed on the same day, proves that the Individual Plaintiffs[*] entered into an overall contract with the government.  The promises

---

[*]    The Individual Plaintiffs include:  Arbur, Inc., the Estate of William E. Simon, Sr., Roy Doumani, Preston Martin, and Beverly W. Thrall.

and obligations within these documents were intended to personally benefit and burden them, independent of their status as shareholders.

At the contract formation stage, the Individual Plaintiffs were the government's only counterparties for purposes of negotiation. Before the acquisition that gave rise to this case, Southern California Savings and Loan Association ("Old Southern") was insolvent and the Federal Savings and Loan Insurance Company ("FSLIC") bore full responsibility for its liabilities. To avoid liquidation, the government actively solicited prospective purchasers or merger partners who might rescue the troubled institution. S. Cal. Fed. S&L Ass'n v. United States, 52 Fed. Cl. 531, 533 (2002) ("SoCal I"). In response, the Individual Plaintiffs submitted a bid expressly conditioned upon the government's promise of substantial capital forbearances. Id. at 535. To this end, they alone negotiated with the government, and Southern California Federal Savings and Loan Association ("SoCal") was later created through the performance of the contract, via a supervisory conversion that occurred at the closing of the transaction on April 30, 1987.

The issue is whether the "government made any promises, contractual or otherwise, that were expressly intended to benefit the shareholders personally, independently of their status as shareholders." Castle v. United States, 301 F.3d 1328, 1338 (Fed. Cir. 2002). The government contends that the Individual Plaintiffs were mere investors in SoCal Holdings, Inc ("SCH"). This narrow characterization, however, ignores the personal and individual contractual obligations that they assumed pursuant to the RCMA. As the trial court found, "[t]he Government specifically required the Individual Plaintiffs to sign and execute the RCMA before [the government] would 'provide [the] financial assistance and indemnification[s] set forth in the Assistance

Agreement.'" <u>S. Cal. Fed. S&L Ass'n v. United States</u>, 57 Fed. Cl. 598, 605 (2003) ("<u>SoCal II</u>") (quoting RCMA, Recital "E," p.2). Moreover, "[t]he personal guarantees represented by their individual signatures provided extra security to the Government that the Individual Plaintiffs would not walk away from the ailing thrift. [The RCMA] imposed obligations on the private signatories for up to 12 years." <u>Id.</u>

While this court is correct that the Entire Agreement clause contained in the Assistance Agreement does not expressly incorporate the RCMA, it fails to accord appropriate weight to the fact that "the very validity of the Assistance Agreement was conditioned upon the Individual Plaintiffs' execution of the RCMA: 'The [FSLIC]'s obligations pursuant to this Agreement are also conditioned upon the following: . . . The execution and delivery by [SCH], [SoCal], and the Investors [each Individual Plaintiff . . . ], as appropriate, of the Regulatory Capital Maintenance Agreement. . . .'" <u>SoCal I</u>, 52 Fed. Cl. at 542 (quoting the Assistance Agreement, sec. 2(b)). The Individual Plaintiffs were essential to the formation of the overall contract in their individual capacities because the FHLBB "explicitly conditioned its approval of the transaction on the execution of the RCMA by the FSLIC, SCH, SoCal, and the Individual Plaintiffs." <u>Id.</u> (citing FHLBB Res. 87-511, p.7). The RCMA is the basic contract document of the transaction on which all other agreements depend. <u>See</u> <u>Castle</u>, 301 F.3d at 1339 (referring to the RCMA at issue as the "main document comprising the alleged contract"). Accordingly, the combined documents constitute an overall contract giving the Individual Plaintiffs standing to enforce both the capital credit and the supervisory goodwill promises of the government and I would affirm the Court of Federal Claims on this point.