GAJARSA, Circuit Judge,
dissenting.
In this, another case in the series of Winstar-related cases, the issue before the court is a simple one — whether a corporate holding company, which is a shareholder with no direct injury and no privity of contract, has standing to bring an action for damages incurred by one of its subsidiaries. In other words, does a shareholder in its legal capacity as a shareholder have standing to sue? For the reasons stated below, I dissent because the majority fails to recognize the corporate form and attendant corporate law limiting the Lability and thereby the standing of shareholders.
CHTE was a savings and loan diversified holding company and as such was the principal shareholder of Southwest Savings Association (“SSA”), a FSLIC insured savings and loan. The majority premises its holding on the basis that “CHTE [the shareholder] was critical to the acquisition of the failing thrifts because it was a condition of FSLIC entering into the Assistance Agreement [not executed by CHTE] that the $25 million of subordinated debt of [SSA] be converted to equity capital.” Op. at 1051. Moreover, it states that “[CHTE’s] ownership interest in SSA could not have been diluted without [CHTE’s] agreement” to be diluted, citing to the Court of Federal Claims (“CFC”). 65 Fed.Cl. at 288. The CFC found that CHTE provided material consideration for the acquisition, namely converting certain subordinated notes and the issuance of stock warrants. Op. at 1051. However, this is faulty factual and legal analysis. A proper inquiry reveals that CHTE did not issue the warrants — they were issued by SSA and for SSA stock, not for any interest in CHTE. Furthermore, the contribution by CHTE of the SSA subordinated debt was exchanged at the request of CHTE and for the release of CHTE from a prior Net Worth Maintenance (NWM) obligation that was issued by CHTE. This subordinated debt of SSA was held by CHTE to obtain the government’s approval for several non-assisted and unrelated prior acquisitions by CHTE in 1983 and 1986. All of these actions by CHTE were undertaken not as a principal party to the transaction at issue but as a stockholder in SSA, which was the acquiring corporate entity used to acquire the four failing thrifts. Contrary to the majority finding that there was a separate contract existing between the government and CHTE, there *1055 is no contract. There is no contract that creates a “mutual reciprocal obligation” between CHTE and the government. This is the reason why the majority and the CFC need to find the presence of an “overarching” agreement. By the mere use of the term, the majority is admitting that the contract is an epistemological illusion. CHTE did not sign any agreements and was not obligated to perform any contractual action or assume any debt in the transaction. Therefore, the finding of a contract is illusory.
The SSA and FSLIC entered into four Acquisition Agreements for each of the failed thrifts. Each of the agreements contained a “sole benefit” clause that stated the agreements were for the benefit only of SSA and FSLIC. Moreover, SSA and FSLIC also signed an Assistance Agreement that identified SSA as the acquiring corporation and contained a similar sole benefit clause recognizing only SSA and FSLIC. Among other matters, the agreement contained the following relevant terms:
1. SSA performance was conditioned on the release of CHTE from its NWM commitments.
2. FSLIC conditioned performance on conversion of SSA’s debt to stock and issuance of warrants by SSA.
3. FSLIC then provided financial assistance to the SSA in the form of $307.5 million in capital credit to remain on SSA’s books for ten years without amortization.
4. An Integration clause stating that the writing constituted the entire agreement and the acquisition agreements and resolutions or letters by the parties, but that where there was any conflict the Assistance Agreement would govern.
Here the shareholder CHTE was provided an opportunity to limit its liability by eliminating the NWM obligation and expanding the capital of its subsidiary SSA. It essentially was the principal shareholder in SSA without any contractual obligations to contribute any further capital. Its percentage ownership in SSA was reduced by the acquisition but SSA was a vastly larger post-merger subsidiary. In its capacity as a shareholder, CHTE may only bring an action derivatively for a corporate injury, but typically, “shareholders do not have direct standing to bring the cause of action” for damages incurred by the corporation. Franchise Tax Bd. v. Alcan Aluminium, 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). The cause of action, if any, belongs to the corporation.[1]
The government correctly argues that CHTE is a classic shareholder with no standing to assert a breach of contract because the contract was between its subsidiary SSA and the United States. CHTE contends that it has standing because even though it is not a signatory on the Assistance Agreement or any other document, it was a party to the “overarching” or “overall” contract created by its prior application to merge a subsidiary and the FHLBB’s resolutions.
The problem we as a court are confronting is the conflicting precedential cases from this court that seem on first blush, to support the respective position of each party regarding standing.[2] The government argues that Southern California Federal Savings & Loan Assoc. v. United *1056 States, 422 F.3d 1319 (Fed.Cir.2005) (“So-Cal”) is applicable.[3] There we held the CFC’s grant of standing in a similar contract to be error and reversed. CHTE cites our decision in Home Savings of America v. United States, 399 F.3d 1341 (Fed.Cir.2005). There we upheld the CFC’s grant of standing.
In SoCal, Individual Plaintiffs proposed to the government their plan to form and personally capitalize a holding company, known as SoCal Holdings (“SCH”), which would purchase a failing thrift, Old Southern, and form a new savings and loan association. 422 F.3d at 1325. Upon government approval, the new savings and loan, named Southern California Savings & Loan (“SoCal”), would acquire the assets and liabilities of Old Southern. Id.
The government approved the acquisition and entered into a series of agreements. Among these was the Assistance Agreement, which was entered into by SCH. It contained a “Sole Benefit” provision describing the parties to the agreement as the sole beneficiaries entitled to rights. Id. at 1329. Moreover, the agreement had an “Entire Agreement” clause identifying the Assistance Agreement as the sole agreement excepting only resolutions or letters concerning the conversions. Id. After FIRREA, SoCal had some financial difficulties, and was forced to dispose of assets and raise additional capital from its investors. Id. at 1326. The effect was to dilute the ownership of the Individual Plaintiffs in SCH. Gradually, SoCal improved after the infusion of new capital. Id. at 1327.
The Individual Plaintiffs sued the United States in the CFC. The CFC held that the Individual Plaintiffs were in privity of contract and therefore had standing to sue. Id. Similar to our case now, the CFC in SoCal determined that the Individual Plaintiffs were parties to an “overall” contract with the government because they had negotiated with the government before the creation of SCH and the government knew the Individual Plaintiffs would be supplying the money used to rehabilitate SoCal. Id. at 1331. Furthermore, the court found that the Assistance Agreement was part of the overall contract and that its sole benefit provision was unenforceable because the Entire Agreement Clause would have allowed inclusion of the Regulatory Capital Maintenance Agreement (“RCMA”) to which the Individual Plaintiffs were a party. Id. at 1329.
In SoCal, we reversed the CFC. First, we rejected the court’s interpretation of the Entire Agreement clause to read out the Sole Benefit clause. Id. at 1329-30. We noted that the Entire Agreement clause only included resolutions or letters and not the RCMA. Id. at 1330. Further, we interpreted the RCMA to be a completely separate contract with its own Entire Agreement clause. Id. Next, we rejected the importance the CFC gave to the Individual Plaintiffs’ participation in the negotiation and contracting process because there was no unity of interest with SCH and SoCal that would work an injustice if the corporate form were observed. Our conclusion was based on the recognition of the corporate form the Individual Plaintiffs established. Id. at 1331-32. We did, however, note that the Individual Plaintiffs were in privity with the government on the RCMA but could not recover *1057 the damages sought under the RCMA. Id. at 1334.
In Home Savings, Home Savings (“Home”), a wholly-owned subsidiary of H.F. Ahmanson & Co. (“Ahmanson”), acquired 17 thrifts in four transactions at issue in the appeal. 399 F.3d at 1344-45. Each transaction was memorialized in an assistance agreement. Id. at 1345. The “Florida/Missouri” and “Illinois/Texas” Assistance Agreements contained integration clauses that included FHLBB resolutions and letters issued with the agreements. The “Century” and “Ohio” agreements also integrated certain resolutions addressed to the transactions. Id. In each transaction, “Ahmanson sought federal assistance to mitigate the liabilities its subsidiary, Home, was assuming.” Id. In resolutions and forbearances for each transaction, FHLBB agreed that Home could count supervisory goodwill toward reserve capital and that it would not take action against Home for failing to meet reserve capital. Id.
Even though Ahmanson was not a signatory of the assistance agreements and the agreements contained sole benefit clauses, this court affirmed the CFC’s conclusion that Ahmanson was in privity with the government. Id. at 1348-50. In Home Savings, we approved the CFC’s determination that Ahmanson was a party to a much larger “overall” transaction because the resolutions contained reciprocal promises between the government and Ahman-son. Namely, Ahmanson promised it would maintain Home’s net worth, and the government promised it would provide financial assistance in the form of special accounting treatment. Id. at 1349. Furthermore, the court approved the CFC’s recognition that Ahmanson was the offeror that initiated negotiations that eventually led to the agreement. Id. at 1349-50.
It is difficult to reconcile these conflicting cases. In Home Savings, we considered the shareholder’s participation in the negotiation very important, whereas in So-Cal, the participation did not overcome the fact that the subsidiary was the actual party to the contract. Furthermore, in Home Savings, we recognized that the negotiations, offers, agreements, and resolutions made an overall contract, whereas SoCal did not recognize the existence of an overall contract.
The key feature in both cases is the sole benefit and entire agreement clauses. In Home Savings, the sole benefit clause was virtually ignored because the integration clause included resolutions that contained reciprocal promises between the shareholder and the government. In SoCal, however, the court gave significant weight to the clauses because the Entire Agreement clause had not integrated the RCMA, which was the only document signifying an agreement with the shareholders.
In the present case, the Entire Agreement clause (“EA clause”) and the Sole Benefit clause (“SB clause”) serve to prevent CHTE from benefiting under the contract. The SB Clause states that the Assistance Agreement, which includes a condition for release of CHTE, is for the Sole Benefit of the parties and not CHTE. Thus, to this extent, the Assistance Agreement is the entire agreement and where there is a conflict, it is the controlling document. Therefore, the only parties to the enforceable agreement are the FHLBB and SSA, not CHTE. Any other documents that CHTE relies on to be considered a contracting party are precluded by the EA and SB clauses. It is not in privity with any of the agreements.
As in SoCal, CHTE may have negotiated the contracts as the CFC found, but they did not structure their commitments in any way that makes them liable. In *1058 stead, all the legal obligations are issued by the subsidiary making the subsidiary liable. CHTE places great weight on the resolutions, releases, and forbearances suggesting that CHTE was a party and negotiated a release of its NWM commitments in exchange for the subordinated debt. These facts, however, support the proposition that CHTE was acting solely as the shareholder parent and not as a party in privity of contract. By releasing itself from the liability of maintaining SSA’s net worth, it distanced itself from SSA’s failure and agreement to acquire insolvent institutions. Unlike Home Savings there are no “mutual, reciprocal obligations” where the shareholder further increased its liability for maintenance of the net worth; here, CHTE had no such liability as a shareholder of SSA.
Moreover, CHTE places great weight on the H-(e)3 application and its implications as an overall contract. But, there is no indication that the application is separate from the Assistance Agreement that included a sole benefit clause and removes any conflict among the parties. Moreover, the resolution authorizes and approves the execution by FHLBB of the agreements. The release obtained by CHTE was for its benefit, and as a shareholder, it negotiated that release as a condition of SSA’s participation in the Assistance Agreement. CHTE thereby had no financial or legal obligation under any agreement, and it was not a signatory to any agreement that would provide the required Article III standing.
At most, we could consider the government’s release of CHTE from the NWM commitments as a contract between the government and CHTE. Though the Release references the Assistance Agreement, it does so only to note that it is a condition of SSA’s performance. The Release itself states that the government releases CHTE from the commitments in return for the conversion of $25 million in subordinated debt to equity in SSA. CHTE was not exposed to any liability as a shareholder under the SSA contracts. There is no indication that CHTE retained any benefits from the contract/condition and no evidence that the government intended it. The only party in interest here is SSA and not the shareholder CHTE. Similarly, in Domino’s Pizza Inc. v. McDonald, — U.S. -, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006) where a contract right was created between the company and the franchisee, the shareholder had no contract rights. Specifically, the Court held that:
[I]t is fundamental corporation and agency law — indeed, it can be said to be the whole purpose of corporation and agency law — 'that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation’s contracts.
Id. at 1250-51.
Here we have the classic case where there is only a mist of evidence that the majority endeavors to make into a cloud of evidence. But as we have stated previously “there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable rights.” D & N Bank v. United States, 331 F.3d 1374, 1377 (Fed.Cir.2003).
This action fails to meet Article III standing requirements. However, the majority has allowed a shareholder to recover on a cause of action premised upon “privity” of an “overarching” contract between a shareholder and the government. We once again find privity of contract where no contractual obligation or consideration *1059 on the part of the shareholder exists.[4] There is no “overarching” agreement which is enforceable by the shareholder. The “overarching” is as illusory as a rainbow, and in this particular case the shareholder has indeed found a pot of gold at the end.
To allow CHTE standing not only violates Article III but also the corporate form, as well as the intent of the parties in negotiating the Entire Agreement-type clauses. Thus, CHTE has no standing, and the CFC judgment should be reversed. The majority continues to deny the existence of a legal differentiation between a corporation and its shareholder. Here, the shareholder’s use of a corporate structure to limit its liability should be respected. We should not, however, permit what in essence is a reverse corporate veil piercing by the shareholder allowing it to recover damages under an “overarching” agreement. The majority grants standing to a non-contracting party. Moreover, we fail to enforce classic corporate contract clauses that are negotiated and accepted by the contractual parties. For these reasons, I dissent.[5]

. Hypothetically, if SSA were bankrupt, the cause of action belongs to the bankruptcy estate, and the recovery by the trustee would be for the benefit of all creditors and residually to all the shareholders.

. It should be noted that the CFC did not reconcile the conflicting cases nor discuss why it relied on one and not the other.

. See also Cain v. United States, 350 F.3d 1309 (Fed.Cir.2003); FDIC v. United States, 342 F.3d 1313 (Fed.Cir.2003); Bailey v. United States, 341 F.3d 1342 (Fed.Cir.2003); Maher v. United States, 314 F.3d 600 (Fed.Cir.2002); and Glass v. United States, 258 F.3d 1349 (Fed.Cir.2001), all of which have con-eluded that shareholders have no standing to sue.

. The majority states that the government does not challenge the trial court's finding that the enactment of FIRREA was not a material breach of the government's contract with CHTE; however, the government challenges the existence of the contract with CHTE. The majority cannot grant CHTE standing without the existence of the illusory “overarching” contract.

. The majority does not allow the recovery of CHTE’s equity. I agree; however, I dissent to the basic principle that standing is allowed premised on an "overarching” agreement.